**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT
9                          NORTHERN DISTRICT OF CALIFORNIA
10
11  CHIQUITA   FRESH   NORTH   AMERICA,          No. C-11-06683 DMR
    L.L.C.,
12                                               **ORDER GRANTING IN PART**
                    Plaintiff,                   **PLAINTIFF'S MOTION FOR PARTIAL**
13                                               **SUMMARY JUDGMENT [DOCKET NO.**
         v.                                      **53]**
14
    GREENE  TRANSPORT  COMPANY,  JOHN
15  GREENE LOGISTICS COMPANY, and DOES
    1 through 10, inclusive,
16
                    Defendants.
17  _____/
18
19          Before the court is the motion for partial summary judgment filed by Plaintiff Chiquita Fresh

20  North America, L.L.C. ("Plaintiff" or "Chiquita").  Plaintiff moves the court to enter summary

21  judgment in favor of Plaintiff and against Defendant Greene Transport Company ("GTC") on the

    First and Second Causes of Action in Plaintiff's First Amended Complaint ("FAC") [Docket No.
22
    33].[1]  For the reasons stated below, the motion is granted in part and denied in part.
23
                           **I. BACKGROUND AND FACTS**
24
25
26  _____
27          [1] Defendant John Greene Logistics Company ("JGLC") joined GTC's Opposition to the Motion
    because "[P]laintiff alleges that JGLC is the agent, principal, and/or alter ego of GTC . . . [and] JGLC
28  potentially has an interest in the outcome of [P]laintiff's motion against GTC."  Joinder [Docket No. 57]
    at 1.

**United States District Court**
For the Northern District of California

**A.  The Carrier Agreement**

Plaintiff and GTC entered a Carrier Agreement through which GTC agreed to transport Plaintiff's products.  The Carrier Agreement became effective June 15, 2009, and was in effect on the dates relevant to this case, namely August 31, 2010 and September 1, 2010.  The Carrier Agreement identifies Plaintiff as "Chiquita" and GTC as "Carrier."

**i.  The Indemnity and Defense Provision**

Article 6 of the Carrier Agreement requires GTC to defend and indemnify Plaintiff under certain circumstances:

> INDEMNITY.  [GTC] shall indemnify, defend and hold Chiquita . . . harmless from and against all damages, losses, costs, claims, injunctive relief, fines, penalties, settlements, charges and expenses (including attorneys' fees, expenses, disbursements and court costs), and all other expenses relating to or arising from all claims of every nature or character (including, without limitation, claims for personal injury, death and damage to property) . . . arising out of or in connection with the loading, handling, transportation, unloading or delivery of any shipment under this Agreement by [GTC] or any substitute service provider providing transportation services to Chiquita pursuant to this Agreement.

Docket No. 53-1 at Ex. A ("Carrier Agreement") at art. 6.  The remainder of the Article addresses the defense and indemnity obligations of any "substitute service provider":

> Without limiting the generality of the foregoing, [GTC] agrees that if [GTC] uses a substituted service for the transport of any Goods for or on behalf of Chiquita, [GTC]'s agreement with such substitute service provider shall contain the substitute service provider's agreement to indemnify, defend and hold Chiquita and its agents and employees harmless from and against all indemnified Claims arising out of or in connection with the loading, handling, transportation, unloading or delivery of any shipment under this Agreement by the substitute service provider.

*Id.*

**ii.  The Insurance Provisions**

Paragraph 9.1 of the Carrier Agreement governs GTC's obligation to maintain insurance coverage:

> Insurance Policies.  At all times during the term of this Agreement, [GTC] shall maintain and keep in force the following insurance coverage:
>
> (A) General Liability Insurance for Comprehensive and Contractual Coverage with a minimum of liability of $2,000,000 per occurrence.  Chiquita and its Affiliates shall be named as additional insureds.  There may be no self insured retention or deductible without the prior written consent of Chiquita.

(B) Automobile Liability for non-owned autos with a minimum liability of $2,000,000 per occurrence.  Chiquita and its Affiliates shall be named as additional insureds.  There may be no self insured retention or deductible without the prior written consent of Chiquita.

Carrier Agreement at ¶ 9.1.  Paragraph 9.4 governs the insurance coverage that subcontractors must provide:

> Subcontractors.  [GTC] represents and warrants that any subcontractors utilized by [GTC] shall maintain insurance coverage in the minimum amounts set forth in this Agreement, and [GTC] agrees to indemnify and hold Chiquita harmless from and against any loss or liability incurred by Chiquita arising from the failure of any subcontractor of [GTC] to maintain said insurance in accordance with this Section 9.4.  Upon request, [GTC] shall provide Chiquita evidence that any subcontractors utilized by Carrier maintain insurance coverage in the minimum amounts set forth in Section 9.1.

*Id.* at ¶ 9.4.

### iii.  The Subcontracting Provision

Paragraph 3.5 of the Carrier Agreement addresses GTC's use of subcontractor or substituted services for Plaintiff's goods.  It also addresses the insurance any provider of substitute services is required to maintain:

> Subcontractors.  [GTC] agrees not to interline, subcontract or use other motor carriers or brokers, or to use substituted services by rail for Chiquita's Goods without prior written agreement of Chiquita.  Without limiting the foregoing, Chiquita hereby approves of [GTC]'s use of each of the subcontractors listed in Appendix C; provided, however, Chiquita may revoke its approval of one or more of such subcontractors in the event that such subcontractors fail to ship Chiquita's Goods in accordance with the terms of this Agreement.  When for [GTC]'s convenience, [GTC] elects to use a pickup or delivery agent to serve a point it is authorized to serve, [GTC] may do so at its expense, in which case [GTC] shall continue to be fully liable for any loss, damage or delay to said shipments.  In the event [GTC] uses a substituted service of any type, with or without Chiquita's permission, [GTC] agrees to remain liable for any loss, damage or delay to Chiquita's Goods incurred in transit to the same extent that [GTC] would be liable if it performed the transportation directly, and to require any provide of substitute services to maintain the types and amounts of insurance required to be maintained by [GTC]  pursuant to Article 9 below.

*Id.* at ¶ 3.5 (emphasis in original).

### iv.  Choice of Law Provision

The Carrier Agreement states that its provisions shall be construed according to Ohio law, and that claims arising under it shall be brought in California:

> Governing Law.  The provisions of this Agreement shall be construed and enforced according to the laws of the State of Ohio, without giving effect to principles of conflict of laws, to the extent that the former are not inconsistent with the applicable federal or state regulatory laws binding upon Carrier.  All controversies and claims arising hereunder, and all

3

actions and proceedings to enforce this Agreement, shall be brought in the State of California.

*Id.* at ¶ 13.3.

## B.  Insurance Certificates

GTC provided Plaintiff with a Certificate of Insurance dated February 26, 2009  ("2009 Insurance Certificate").  Plaintiff received the 2009 Insurance Certificate about a week after it was issued.  The Certificate indicated that Plaintiff was an additional insured on the Automobile Liability policy issued to GTC by Northland Insurance Company ("Northland").  The Automobile Liability policy covers only specifically listed automobiles.

GTC provided Plaintiff with a Certificate of Insurance dated February 26, 2010 ("2010 Insurance Certificate").  Plaintiff received the 2010 Insurance Certificate about a week after it was issued.  As with the 2009 certificate, the 2010 certificate indicated that Plaintiff was an additional insured on the Automobile Liability policy issued to GTC by Northland and that the Automobile Liability policy covered only specifically listed automobiles.

The parties do not point to any other insurance certificates, e.g., any general liability insurance policies meeting the requirement in Paragraph 9.1(A) of the Carrier Agreement, or any automobile liability policies covering non-owned autos.

## C.  The August 31, 2010 Haul, September 1, 2010 Accident and Florida Action

On or about August 31, 2010, Plaintiff requested that GTC pick up a load consisting of 20 pallets of pineapples in Port Everglades, Florida and deliver them the following day to Forest Park, Georgia (the "August 31 haul").  GTC's own truck was unavailable, so GTC used its related company, JGLC, to broker another carrier.  JGLC hired Ajax Logistics, Inc. ("Ajax") to transport the pineapples.  GTC has admitted that Ajax was a "substitute service provider," as defined in Article 6 of the Carrier Agreement.  According to Plaintiff's records, drivers from Ajax had picked up loads under the Carrier Agreement from Plaintiff's Port Everglades, Florida facility on 15 occasions between February 25, 2010 and August 31, 2010.

On August 31, 2010, Ajax transported the load out of the Port Everglades facility.  On September 1, 2010, in the course of transporting the load, Ajax had an accident (the "Accident") in

**United States District Court**
For the Northern District of California

1  Osceola County, Florida, which resulted in the deaths of Cassandra Green and her son, Steven

2  Holtzapple, Jr.  The personal representatives of the decedents filed wrongful death actions in Florida

3  state court, eventually naming Plaintiff, GTC, JGLC, Ajax, the driver and the purported owner of the

4  truck as defendants in lawsuits that have since been consolidated.  *See Holtzapple v. Ajax et al.*, Case

5  No. 10-CA-7095 AN (22) (Fla. Cir. Ct. Feb. 6, 2012) ("the Florida Action").

6         GTC sent an invoice for the August 31 haul, which Plaintiff paid.

7  **D.  The *Castlepoint* Action**

8         On or about November 21, 2010, Ajax's insurer Castlepoint Insurance Company

9  ("Castlepoint") filed a declaratory judgment action against Plaintiff and all potential plaintiffs and

10 defendants in the Florida Action seeking declaratory judgment that Castlepoint owed no defense or

11 indemnity obligation for any monies relating to the Accident.  *Castlepoint National Ins. Co. v. Ajax*

12 *Logistics, Inc., et al.*, Case No. 10-CV-62266-MGC (S.D. Fla. [N.D.] 2010) ("the *Castlepoint*

13 Action").

14 **E.  GTC Agrees to Defend and Indemnify Plaintiff After the *Castlepoint* Lawsuit**

15        On February 8, 2011, Plaintiff's counsel wrote the following to GTC's counsel: "As per our

16 conversations from last week, this confirms you are defense counsel for my client . . . in the

17 [*Castlepoint* Lawsuit] and that this defense will be paid for by Greene Transport . . . . Please confirm

18 that pursuant to the [Carrier Agreement], Greene Transport will continue to defend and indemnify

19 Chiquita in all litigation arising out of this accident."  The letter requested that GTC's counsel "sign

20 the bottom of this letter as confirmation of this agreement."  GTC's counsel signed the bottom of the

21 letter on February 22, 2011, and returned it with a cover letter stating:  "Enclosed please find your

22 February 8, 2011 letter which has been executed regarding Greene Transport's agreement to

23 continue to defend and indemnify Chiquita in all litigation arising out of this accident."[2]

24 **F.  GTC and Northland's Refusals to Defend and Indemnify Plaintiff In the Florida Action**

25        Plaintiff was served with the Florida Action wrongful death suit in September of 2011.  As to

26 Chiquita, the operative complaint alleges that the maximum load to be transported in the trailer in

27 _____

28        [2]  This exchange will hereinafter be referred to as the "Feb. 22 Agreement."

question was 80,000 pounds, that Chiquita knew or should have known that fact, and that Chiquita intentionally overloaded the trailer with complete disregard for public safety in such a way that the load was likely to shift and the trailer was likely to overturn.  Holtzapple and Green each allege a cause of action for negligence against Chiquita based on the above allegations.  They also allege causes of action of negligence against the driver of the trailer for allegedly driving at an excessive and unsafe speed; vicarious liability against Ajax for the acts of the driver; negligence against Ajax for permitting the driver to drive, not having a current commercial vehicle inspection sticker, and not keeping the trailer in a safe mechanical condition by permitting it to be operated with defective brakes; negligence against the owner of the trailer for failing to insure that it was not in defective mechanical condition; breach of contract against GTC for subcontracting the haul without prior written agreement; and against JGLC for negligent selection, hiring, and retention of Ajax.

On September 13, 2011, Plaintiff tendered its defense and indemnity for the Florida Action to GTC pursuant to the Carrier Agreement, and to GTC's insurer, Northland, which had issued the Certificate of Insurance.  On October 5, 2011, GTC denied Plaintiff's tender and has refused to defend or indemnify Plaintiff.  On September 20, 2011, Northland denied that Plaintiff was an additional insured and refused to defend or indemnify Plaintiff.  On February 14, 2012, after learning that Northland was defending GTC in the Florida Action, Plaintiff re-tendered its defense to Northland.  That re-tender was denied on March 15, 2012.

## II. LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  A moving party may meet this burden by "'showing . . . that there is an absence of evidence to support the nonmoving party's case.'"  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (quoting *Celotex Corp.*, 477 U.S. at 325) (quotation marks omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof that would

United States District Court

For the Northern District of California

1   be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could

2   return a verdict in that party's favor.  *Anderson*, 477 U.S. at 248.  The court may not weigh the

3   evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

4         To defeat summary judgment once the moving part has met its burden, the nonmoving party

5   may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit

6   or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine

7   issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

8   (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence" to support the

9   non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See*

10  *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "[w]hen opposing

11  parties tell two different stories, one of which is blatantly contradicted by the record, so that no

12  reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on

13  the motion.  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

14        **III. DISCUSSION**

15        Plaintiff moves for partial summary judgment against GTC on the First and Second Causes

16  of Action in the FAC.  The First Cause of Action states a claim for breach of contract against GTC.

17  FAC ¶¶ 31-39.  Plaintiff alleges that GTC breached the Carrier Agreement and the Feb. 22

18  Agreement by (1) refusing to defend[3] Plaintiff in the Florida Action; (2) failing to obtain and

19  maintain the insurance required by the Carrier Agreement and to have Plaintiff named as an

20  additional insured; (3) substituting carriers without obtaining Plaintiff's prior approval; and (4)

21  refusing to defend Plaintiff after the substitute carriers refused to defend Plaintiff, and failing to

22  insure that Ajax had the insurance required by the Carrier Agreement.  The Second Cause of Action

23  seeks declaratory judgment that GTC breached the Carrier Agreement and the Feb. 22 Agreement,

24  and that GTC is liable to Plaintiff for damages attributable to GTC's breach of the Carrier

25  Agreement and Feb. 22 Agreement.  *Id.* at ¶¶ 40-43.

26  ───────────────

27      [3]   Under Ohio law, the "duty to defend is broader than and distinct from [the] duty to indemnify."  *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 951 (6th Cir. 2009) (quotations omitted).  In the motion, Plaintiff seeks summary judgment only for GTC's alleged failure to defend, not any alleged failure to indemnify.

28

**United States District Court**
For the Northern District of California

**A. Choice of Law**

The court first considers the threshold issue of which state's substantive law applies in this dispute. At the hearing, the parties agreed that the outcome of the issues in this particular motion would be the same whether the court applied Ohio or California law. *See also* GTC Supp. Brief [Docket No. 62] at 5 ("GTC believes the result of these narrow issues would be the same whether the Court applies Ohio or California law. Accordingly, it did not urge the application of California law in its opposition to Chiquita's motion."). Nonetheless, the motion and supporting materials (including the supplemental briefing on the choice of law issue that the court ordered the parties to file) put forth sufficient undisputed material facts for the court to determine the choice of law issue at this time. *See* Fed. R. Civ. P. 56(f) ("After giving notice and reasonable time to respond, the court may . . . (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."). Determining the choice of law issue at this stage of the litigation is also in the interest of judicial economy, since it would waste judicial resources to consider the Carrier Agreement under both California and Ohio law now when the court may have to determine which state's laws apply in later proceedings.

Because the court exercises diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, it applies the law of the forum state, California, to determine whether to enforce the parties' contractual choice of law provision. *See Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). In determining the enforceability of arm's-length contractual choice of law provisions, California courts apply the principles set forth in Restatement (Second) of Conflict of Laws ("Restatement") section 187, which "reflect a strong policy favoring enforcement of such provisions." *Nedlloyd Lines B.V. v. Super. Ct. of San Mateo Cnty.*, 3 Cal. 4th 459, 464-65 (1992) (footnotes omitted). *See also Medimatch, Inc. v. Lucent Technologies Inc.*, 120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000) ("Under California law, a choice of law made by sophisticated commercial parties through arm's length negotiation will be enforced unless the chosen law conflicts with a fundamental public policy of California.") (citing *Nedlloyd*).

The choice of law analysis under section 187 of the Restatement requires the court to first determine: (1) whether the chosen state has a substantial relationship to the parties or their

transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. *Nedlloyd*, 3 Cal. 4th at 466.  "If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law." *Id.*  However, if either test is met, the court must apply the following analysis:

> [T]he court must next determine whether the chosen state's law is contrary to a fundamental policy of California.  If there is no such conflict, the court shall enforce the parties' choice of law.  If, however, there is a fundamental conflict with California law, the court must then determine whether California has a materially greater interest than the chosen state in the determination of the particular issue . . . . If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy.

*Id.*  "The forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law."  Restatement § 187 cmt. g.

### 1. Substantial Relationship and Reasonable Basis

A "substantial relationship" is present when one of the parties is domiciled in the chosen state.  *Nedlloyd*, 3 Cal. 4th at 467 (citations omitted).  "A party's incorporation in a state is a contact sufficient to allow the parties to choose that state's law to govern their contract."  *Id.* (citations omitted).  "If one of the parties resides in the chosen state, the parties have a reasonable basis for their choice."  *Id.* (citations omitted).

Chiquita contends that Ohio has a substantial relationship to the parties and/or their transactions and there is a reasonable basis for the parties' choice of law.  It asserts that Chiquita is incorporated in Delaware and has had its headquarters and principal place of business in Cincinnati, Ohio at all relevant times.  Chiquita's Request for Judicial Notice [Docket No. 64] at ¶¶ 3-4, Exs. B and C (incorporation records from Delaware and Ohio Secretaries of State).[4]  GTC does not dispute

---

[4]  The court takes judicial notice of the incorporation records, as pertinent facts contained in these records are not subject to reasonable dispute because  they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

United States District Court

For the Northern District of California

1  that these prongs of the choice of law analysis are met.[5]  Accordingly, the court finds that the first

2  two prongs of the California choice of law analysis have been fulfilled.

3        **2. Whether Ohio Law is Contrary to a Fundamental Policy of California**

4        There are no "bright line rules for determining what is and what is not contrary to a

5  fundamental policy of California." *Discover Bank v. Superior Court*, 134 Cal. App. 4th 886, 893, 36

6  Cal. Rptr. 3d 456, 460 (Cal. Ct. App. 2005); Restatement § 187 cmt. g. ("No detailed statement can

7  be made of the situations where a 'fundamental' policy of the state of the otherwise applicable law

8  will be found to exist.")  Comment g to Section 187 of the Restatement takes a sliding scale

9  approach to this prong of the California choice of law analysis, noting that "[t]he more closely the

10  state of the chosen law is related to the contract and the parties, the more fundamental must be the

11  policy of the state of the otherwise applicable law to justify denying effect to the choice-of-law

12  provision."  A policy may be considered "fundamental" when it is "embodied in a statute which

13  makes one or more kinds of contracts illegal or which is designed to protect a person against the

14  oppressive use of superior bargaining power."  Restatement § 187 cmt. g.

15        GTC argues that application of Ohio law would "violate California law to the extent GTC

16  would be required to indemnify Chiquita for its sole negligence or willful misconduct."  GTC Supp.

17  Brief at 3.  In California, any provision in a trucking contract that purports to indemnify the

18  promisee for liability against wrongful death damages caused by his "sole negligence or willful

19  misconduct" is invalid.  *See* Cal. Civil Code § 2784.5.  The relevant portion of the statute prohibiting

20  such agreements states:

21        Any provision, promise, agreement, clause, or covenant contained in, collateral to, or
      affecting any hauling, trucking, or cartage contract or agreement is against public policy,

22        void and unenforceable if it purports to indemnify the promisee against liability for any of
      the following damages which are caused by the sole negligence or willful misconduct of the

23        promisee, agents, servants, or the independent contractors directly responsible to the
      promisee, except when such agents, servants, or independent contractors are under the direct

24

25  ─────────────────────

26     [5]  GTC says that "Ohio has a relationship to the parties and/or their transactions sufficient to
support the application of Ohio law" and "there are reasonable bases for the parties' choice of law" but

27  only to the extent "that Ohio law does not conflict with a fundamental policy of California."  *Id.*
Whether the choice of Ohio law conflicts with a fundamental policy of California is a separate prong

28  of the California choice of law analysis, so GTC concedes that the "substantial relationship" and
"reasonable basis" prongs are met.

supervision and control of the promisor: (a) Damages arising out of bodily injury or death to persons.

*Id.*

Chiquita admits that "Ohio does not have any similar provision" and "Ohio allows full indemnity [while] California does not." Chiquita Supp. Brief at 5. But Chiquita argues that Section 2784.5 is likely inapplicable to any indemnity claim it would make against GTC for several reasons.

First, Chiquita argues that "Section 2784.5, by its own terms, has no effect on the insurance provisions being relied on by GTC and its insurer in denying Chiquita coverage." Chiquita Supp. Brief at 5. Section 2784.5 states that it "shall not affect the validity of any insurance contract, workmen's compensation insurance contract, or agreement issued by an admitted insurer . . . or insurance effected by surplus line brokers . . . ." The Carrier Agreement is a commercial contract that contains an indemnity and defense provision. It is not clear whether the Carrier Agreement would qualify as an insurance contract or agreement under the statute, and Chiquita did not provide any supporting authority for its statutory interpretation. The court thus cannot say whether the Carrier Agreement is an "insurance contract" that is exempted from Section 2784.5.

Next, Chiquita asserts that the Ajax driver "supervised and/or approved the load which was then under his control," making Section 2784.5 inapplicable. *See* Cal. Civ. Code § 2784.5 (prohibition against indemnity for sole negligence does not apply when the promisee's "agents, servants or independent contractors are under the direct supervision and control of the promisor"). Finally, Chiquita argues that "in this case, there is no claim of sole negligence." Chiquita Supp. Brief at 5. Both of these arguments raise issues of fact that may not be determined until the resolution of the Florida Action. For example, resolution of that case will determine whether or not Chiquita is "solely" liable for the Accident or whether it engaged in willful misconduct, in which case Section 2784.5 potentially could operate to invalidate the Carrier Agreement insofar as it creates a duty for GTC to indemnify Chiquita for Chiquita's sole negligence or willful misconduct. If such findings were to occur, then the parties' choice of Ohio law could be contrary to a fundamental policy of California as "embodied in a statute which makes one or more kinds of contracts illegal."

**3.  Whether California Has A Materially Greater Interest than Ohio**

United States District Court

For the Northern District of California

Regardless of whether Ohio law would be contrary to a fundamental policy of California, the court nonetheless determines that Ohio law will govern this case because California does not have a materially greater interest than Ohio in this action. "In determining which state has a greater interest, the court considers factors such as "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." *Oestreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061, 1068 (N.D. Cal. 2007) *aff'd*, 322 F. Appx 489 (9th Cir. 2009) (quoting *Application Group, Inc. v. Hunter Group, Inc.,* 61 Cal. App. 4th 881, 903, 72 Cal. Rptr. 2d 73 (1998)).

Chiquita points to several undisputed facts to support its argument for Ohio law. Chiquita's headquarters and principal place of business was Cincinnati, Ohio, at all relevant times. Neither Chiquita and GTC are incorporated in California; GTC is incorporated and has its principal place of business in Florida. The certificates of insurance at issue in this action were delivered to Chiquita's Ohio headquarters. The Carrier Agreement was to be performed in large part in Florida and Georgia.[6] All of these facts either connect the case to Ohio or illustrate that California has little connection to the case.[7] Chiquita admits, however, that its California office signed the Carrier Agreement.

GTC highlighted the following undisputed facts in support of its argument that the court should reject the parties' choice of law and instead apply California law. First, under the Carrier Agreement, notices to Chiquita were to be sent to its office in Salinas, California. Second, "[d]uring GTC's business relationship with Chiquita, GTC regularly communicated with Chiquita employees it understood to be based in California." Greene Decl. [Docket 62-1] at ¶ 4. However, as to this

---

[6]  Appendix B to the Carrier Agreement sets forth the rates to be paid by Chiquita for various hauls by GTC. According to Appendix B, there were 46 haul routes that Chiquita could call on GTC to cover. Of these, 37 originated and/or ended in Florida and Georgia, and eight originated or ended in California.

[7]  Chiquita submitted an additional fact after oral argument: The Carrier Agreement was negotiated through Chiquita's headquarters in Cincinnati, Ohio. The court expressly forbade Chiquita from submitting additional facts not previously mentioned in its supplemental brief. The court therefore declines to consider this additional fact in its analysis.

1    second fact, Greene does not state that the communications occurred in conjunction with its

2    performance under the Carrier Agreement. Third, "GTC has shipped at least seven Chiquita loads

3    from, to or through the State of California." Greene Decl. ¶ 4. Again, Greene does not state that

4    these loads were delivered pursuant to the Carrier Agreement. Fourth, "[d]uring the time period that

5    GTC was dealing with Chiquita, GTC shipped loads for various clients from or to California at the

6    rate of approximately one load per week, and GTC has an agent based in Visalia, California."

7    Greene Decl. ¶ 5. GTC cites no cases for its apparent assertion that GTC's connections to California

8    independent of Chiquita, the Carrier Agreement, and GTC's obligations under the Carrier

9    Agreement are relevant to this court's determination of whether California has a materially greater

10   interest than Ohio for purposes of choice of law in this case.

11       The only relevant facts that the parties have put before the court showing a connection

12   between the events of this case and California are that Chiquita signed the contract in California, that

13   eight of the 46 haul routes under the Carrier Agreement originated and/or ended in California, and

14   notices to Chiquita were to be sent to California. These connections to California are relatively

15   weak, especially when considered against Chiquita's residence and operations in Ohio, the fact that

16   the majority of the haul routes under the Carrier Agreement are located outside of California, and

17   California's "strong policy" interests in favor of enforcing arm's-length contractual choice-of-law

18   provisions. Restatement § 187 cmt g.; *Nedlloyd*, 3 Cal. 4th at 465.

19       Accordingly, the court finds that California does not have a materially greater interest than

20   Ohio in the determination of this case, and will thus uphold the parties' contractual choice of law

21   and apply Ohio law.

22   **B. Breach of Agreement to Defend**

23       Plaintiff alleges that GTC materially breached the Carrier Agreement and the Feb. 22

24   Agreement[8] by refusing to defend Plaintiff in the Florida Action, and failing to ensure that Ajax

25

26       [8] The Feb. 22 Agreement is not an independent contract between Plaintiff and GTC. Reply at
27   2 (Plaintiff concedes that the Feb. 22 Agreement "is a recitation, not an extension, of the parties'
     indemnity agreement."); *Rhoades v. Rhoades*, 40 Ohio App. 2d 559, 321 N.E.2d 242, 242 (1974)
28   (promise to perform a pre-existing duty is insufficient consideration to support a contract). Therefore,
     the Feb. 22 Agreement cannot form the basis for a breach of contract claim.

13

United States District Court

For the Northern District of California

1  agreed to defend Plaintiff in the same.  Under Ohio law, the elements of a breach of contract claim

2  are (1) a contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach,

3  and (4) resulting damages.  *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266

4  (Ohio Ct. App. 1996).  GTC does not question the first two elements of Chiquita's breach of contract

5  claims, so the court begins its analysis by determining whether GTC breached the contract.

6          **i. Plain Language of the Carrier Agreement**

7          The Indemnity and Defense Provision requires GTC to "defend [Plaintiff] . . . against all

8  damages . . . [and] expenses ***relating to or arising from all claims of every nature or character***

9  (including, without limitation, claims for personal injury, ***death*** and damage to property) . . . ***arising***

10  ***out of or in connection with*** the loading, handling, transportation, unloading or delivery of any

11  shipment under this Agreement by [GTC] or any substitute service provider providing transportation

12  services to Chiquita pursuant to this Agreement."  Carrier Agreement at art. 6 (emphasis added).

13          When the meaning of a contract is clear on its face, the court will look only to the contract

14  language to discern the parties' intent.  *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34

15  (Ohio 2007); *Ohio Historical Soc'y v. General Maintenance & Eng'g Co.,* 583 N.E.2d 340, 344

16  (Ohio Ct. App. 1989).  "If a contract is clear and unambiguous . . .  there is no issue of fact to be

17  determined."  *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio,* 474 N.E.2d 271, 272-

18  73 (Ohio 1984) (per curiam); *see also Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d

19  672, 683-84 (6th Cir. 2000) (applying Ohio law and quoting *Inland Refuse*).  Generally, contract

20  terms are to be given their ordinary meaning.  *Ohio Historical Soc'y*, 583 N.E.2d at 344.

21          GTC argues that the Indemnity and Defense Provision does not require GTC to defend

22  Chiquita when Chiquita is sued for its own negligence, as opposed to the conduct of GTC or Ajax.[9]

23  However, the plain language of the contract is unambiguous and broad.  It encompasses the

24  negligence claims against Chiquita in the Florida Action, because those claims "aris[e] out of or in

25  _____

26          [9] GTC argues that Florida's abolition of joint and several liability in negligence actions, *see* Fla.
Stat. § 768.81, means Chiquita could only be liable for its own actions, not for the actions of GTC, Ajax,
27  or any other co-defendant in the Florida Action.  Because the court finds that the Indemnity and Defense
Provision requires GTC to defend Chiquita even for claims alleging Chiquita's own negligence, this
28  argument has no effect.

United States District Court
For the Northern District of California

connection with" GTC's (or Ajax's) "loading, handling, transportation, unloading or delivery" of a "shipment under this agreement." *See Bachrach v. Cornwell Quality Tool Co.*, Case No. 25444, 2011 WL 2040865, at *7 (Ohio Ct. App. May 25, 2011) (noting breadth of terms "arising out of" and "in connection with" in Ohio contract law). Nothing in the Indemnity and Defense Provision limits GTC's obligation to defend Chiquita when Chiquita is sued for its own negligence, as opposed to solely on theories of strict liability or respondeat superior. The fact that the Indemnity and Defense Provision does not explicitly state that GTC is obliged to defend Chiquita when it is sued for its own negligence is of no moment, especially because the language is so comprehensive. *See Coulter v. Dayton Power & Light Co.*, 731 N.E.2d 1172, 1174 (Ohio Ct. App. 1999) ("Ohio law does not require that contracts purporting to hold an indemnitee harmless for its own negligence contain express language to that effect . . . . Negligence might have been spelled out specifically, but this is not required.") (citations omitted); *Beaver Adhesives, Inc. v. Ashland, Inc.*, Case No. 03AP-1193, 2004 WL 1795320, at *5 (Ohio Ct. App. Aug. 12, 2004) (not reported in N.E.2d) (holding that duty to defend clause applying to "all" claims encompasses negligence). The court concludes that the Indemnity and Defense Provision clearly encompasses the duty to defend against claims alleging Chiquita's own negligence. *See also Lamson & Sessions Co. v. ATS Logistics Services*, Case No. 05-CV-2702-PAG, 2006 WL 3064098 (N.D. Ohio Oct. 26, 2006) (holding a similar defense and indemnification provision in a carrier agreement "unambiguously requires" carrier to defend shipper in out-of-state wrongful death suit alleging shipper negligently loaded the truck).

### ii. Public Policy

The general rule in Ohio is that indemnity contracts are not against public policy. *See Glaspell v. Ohio Edison Co.,* 505 N.E.2d 264, 266-67 (Ohio 1987); *Stickovich v. City of Cleveland,* 757 N.E.2d 50, 59 (Ohio Ct. App. 2001); *J. Miller Express, Inc. v. Pentz,* 667 N.E.2d 1018, 1021 (Ohio Ct. App. 1995) ("Indemnification is a matter of contract and thus, the parties can agree on [its] scope."). However, GTC argues that even if the court agrees that the Carrier Agreement required GTC to defend Plaintiff in the Florida Action, Ohio contract law prohibits the indemnification and defense of a party for its intentional misconduct or gross negligence as being against public policy. According to GTC, the Florida Action alleges that Plaintiff's loading of the trailer constituted gross

United States District Court

For the Northern District of California

1   negligence and intentional misconduct, and Plaintiff may be found to have acted with that level of

2   culpability.  Thus, GTC claims, summary judgment for Plaintiff on this issue is premature.[10]

3   **a. Willful or Wanton Conduct**

4   GTC relies on several cases to support its argument that Ohio public policy prohibits

5   indemnity agreements for the promisee's willful and wanton misconduct.[11]  All but one of these

6   cases address the promisor's duty to *indemnify* the promisee, not any duty to *defend.*  As previously

7   noted, this motion relates only to Defendants' alleged duty to defend, and not its alleged duty to

8   indemnify Chiquita.  Therefore, these cases are inapposite to this motion.  Moreover, these cases are

9   readily distinguishable on other grounds.  All three cases address the narrow situation of exculpatory

10  releases signed by participants in sports or recreational events.  In each case, a plaintiff who was

11  injured in a recreational activity sued for negligence, and the defendant sought to enforce an

12  exculpatory agreement (that included a duty to indemnify) against the plaintiff in the same lawsuit.[12]

---

15  [10]  Trial in the Florida Action is scheduled for March 2014.

16  [11]  "Willful misconduct" is "conduct involving "an intent, purpose or design to injure." *Zivich*
17  *v. Mentor Soccer Club, Inc.,* 696 N.E.2d 201, 207 (Ohio 1998) (quotations omitted).  "Wanton
18  misconduct" is "conduct where one fails to exercise any care whatsoever toward those to whom he owes
    a duty of care, and this failure occurs under circumstances in which there is a great probability that harm
    will result." *Id.*

19  [12]  In *Zivich*, the Ohio Supreme Court upheld the trial court's grant of summary judgment in
20  favor of a soccer club sued for negligence by the parents of a child injured swinging on an unanchored
    soccer goal, where the parents had signed a release form and there was "no evidence" that the soccer
21  club had acted willfully or wantonly.  696 N.E.2d at 203, 207-08 ("[W]hile a participant in recreational
    activities can contract with the proprietor to relieve the proprietor from any damages or injuries he may
22  negligently cause, the release is invalid as to willful and wanton misconduct.").  In *Bowen v. Kil-Kare,*
    *Inc.*, the Ohio Supreme Court reversed the trial court grant of summary judgment in favor of a racetrack
23  against whom a driver had brought a negligence action for failing to timely stop the race after the
    driver's car became disabled because there was issue of fact regarding whether the racetrack's behavior
24  was willful or wanton conduct.  585 N.E.2d 384, 389 (Ohio 1992) ("It has generally been held that a
    participant in a stock-car race and the proprietor of such activity are free to contract in such a manner
25  so as to relieve the proprietor of responsibility to the participant for the proprietor's negligence, but not
    for the proprietor's willful or wanton misconduct.").  Finally, *Harsh v. Lorain County Speedway, Inc.*
26  involved a summary judgment where there was a genuine issue of material fact regarding whether
27  racetrack's failure to install recommended safety measures amounted to willful and wanton conduct
    leading to injury and death of the plaintiff spectators who had signed exculpatory releases.  675 N.E.2d
28  885, 887-88 (Ohio Ct. App.1996) (quoting above passage from *Bowen*).

United States District Court

For the Northern District of California

None of the cases involve arm's-length transactions between commercial parties, as is the situation presented here.

GTC also points to *Lamson* in support of its argument that Ohio public policy prohibits indemnity *and defense* agreements for the promisee's intentional misconduct. However, *Lamson* suggests that summary judgment in favor of Chiquita would be appropriate. The facts of *Lamson*, an unpublished federal case interpreting Ohio law, are strikingly similar to the facts in the instant case. In *Lamson,* one party to a carrier agreement refused to defend and indemnify the other party in a lawsuit resulting from an accident that occurred involving work performed under the carrier agreement. Lamson had contracted with Sureway to haul loads of Lamson's products. 2006 WL 3064098 at *1. Their carrier agreement required Sureway to defend and indemnify Lamson "against any and all claims . . . arising out of" the performance of the agreement. *Id.* Lamson had a load of pipe that needed to be transported. *Id.* Sureway brokered another trucking company to deliver the load. *Id.* The truck was in an accident and the driver died. *Id.* His widow filed suit against Lamson in Missouri, asserting causes of action for negligence and negligence per se for Lamson's improper and reckless loading of the truck. *Id.* at *1, *6. Sureway refused to defend or indemnify Lamson in the Missouri action, and Lamson then sued Sureway for breach of contract for Sureway's refusal and declaratory judgment. *Id.* at *2. Lamson subsequently moved for summary judgment. *Id.*

The district court first held that the agreement "unambiguously require[d]" Sureway to defend and indemnify Lamson in the Missouri suit. The court then considered Sureway's argument that Ohio's public policy against allowing parties to seek defense and indemnification for willful or wanton acts prohibited Lamson from enforcing the agreement against Sureway for defense in the Missouri action, where the wrongful death plaintiff had alleged that Lamson had acted recklessly. First, the court noted that "Ohio courts do not allow indemnity for willful or wanton acts." *Id.* at *4. For this proposition, the court cited only *Zivich*, *Bowen*, and *Harsh*—all of which, as discussed above, address only Ohio public policy against *indemnity* agreements, not defense agreements, and only in the context of exculpatory agreements signed by participants in recreational activities rather than equally situated commercial parties. Then, the *Lamson* court noted that "the parties agree that an indemnity *clause* does not apply to willful or wanton conduct." *Id.* at *6 (emphasis added). By

United States District Court

For the Northern District of California

referring in one breath to an indemnity *clause* that included both an indemnity and a defense

agreement, the parties and the court in *Lamson* elided the issues.  The *Lamson* court never

considered whether Ohio public policy prohibited *defense* agreements for the promisee's willful or

wanton misconduct.  Because GTC did not present and this court could not find any published Ohio

cases or federal cases interpreting state law holding that Ohio public policy invalidates agreements

purporting to require the promisor to *defend* the promisee for the promisee's willful or wanton

misconduct, the court declines to find that such a public policy restriction exists.[13]

### b. Gross Negligence

GTC also argues that Ohio public policy prohibits contractual provisions that require a party

to be indemnified and defended for its gross negligence.  GTC cites *CitFed Mortgage Corp. of Am.*

*v. Parish*, Case No. 96APE07-909, 1997 WL 156616 at *6 (Ohio Ct. App. Apr. 3, 1997).  In *CitFed*,

a borrower sought indemnification and costs of defense from the lender.  The Ohio Court of Appeals

held that an indemnification clause in a loan agreement violated public policy to the extent that it

would allow a lending institution to escape liability for its own gross negligence or would require

the borrower to pay the lender's expenses and attorneys' fees in defending against the gross

negligence claims.  *Id.*  However, *CitFed* involved a state statute that protected lending institutions

from their own ordinary negligence in making payments to an original contractor, but held them

liable for gross negligence in disbursing such funds.  *Id.*; *see also* Ohio Rev. Code Ann. §

1311.011(B)(5).  The court held that the specific statute "expresses a public policy that lending

institutions be held accountable for their gross negligence in such disbursements."  *Id.*

The *Lamson* court considered an argument identical to GTC's, and noted that "statutory

public policy exceptions are narrowly construed."  *Lamson*, 2006 WL 3064098 at *4-5.  "[I]t is not

---

[13]   There is a good reason why the duty to indemnify may raise public different policy considerations than the duty to defend, because the duty to defend is triggered by "allegations [that] state a claim that *potentially* or *arguably* falls within" coverage, whereas the duty to indemnity is triggered only after liability has been established.  *Ohio Govt. Risk Mgt. Plan v. Harrison*, 874 N.E.2d 1155, 1160 (Ohio 2007) (emphasis added).  *See also Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 127 (Ohio 2006) ("The duty to defend is based on the allegations presented.  The duty to indemnify arises from the conclusive facts and resulting judgment . . . . The duty of defense is much broader than the duty of indemnification and can be invoked even though no liability is ultimately established.") (citations omitted).

**United States District Court**
For the Northern District of California

enough that legislation merely touches upon subject matter; rather, the statute at issue must specifically forbid the enforcement of an indemnity obligation between particular parties." *Id.* The defendant in *Lamson* pointed to no applicable statutory provision that forbade indemnity contracts between shippers and carriers, and the court declined to find that such a public policy rule existed. *Id.* Likewise, GTC points to no statute or expression of public policy that would suggest that defense provisions in a carrier contract covering a supplier's gross negligence would violate public policy, so the court finds no basis for recognizing such a rule.

In sum, the plain language of the Indemnity and Defense Provision requires GTC to defend Chiquita in the Florida Action, and GTC breached the Carrier Agreement by failing to do so and failing to ensure that Ajax do the same.

**C. Breach of Agreement to Obtain and Maintain Insurance Coverage**

Plaintiff alleges that GTC materially breached the Carrier Agreement by failing to ensure that GTC or Ajax obtain and maintain the insurance coverage required by the Carrier Agreement, and by failing to ensure that GTC or Ajax named Plaintiff as an additional insured. GTC does not dispute that it did not name Plaintiff as an additional insured on any general liability policy. GTC also acknowledges that the 2010 Insurance Certificate indicated that Plaintiff was an additional insured on the Automobile Liability policy issued to GTC by Northland but that the Automobile Liability policy covered only specifically listed automobiles. GTC offers two arguments for why these omissions do not constitute breaches of the Insurance Provisions.

**i. Scope of Coverage**

First, GTC argues that the Carrier Agreement required GTC or Ajax only to maintain insurance coverage for claims against Chiquita that GTC was obliged to defend; because GTC was not obliged to defend Chiquita against claims for Chiquita's own negligence, GTC argues, it was not required to obtain the insurance coverage. This argument is unavailing because, as discussed above, the court finds that the Indemnity and Defense Provision required GTC to defend Chiquita even against claims for Chiquita's own negligence.

**ii. Waiver/Implied Modification**

United States District Court

For the Northern District of California

Second, GTC argues that Plaintiff has waived[14] the Insurance Provisions that Plaintiff seeks to enforce through its course of performance of the Carrier Agreement, because Plaintiff accepted insurance certificates showing that Plaintiff was not an additional insured on GTC's General Liability policy, and that GTC's Automobile Liability insurance was for scheduled autos only.

"Parties may implicitly modify an agreement by their actions." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 875 N.E.2d 561, 568 (Ohio 2007) (citing *Automated Solutions*, *supra* n. 14, 856 N.E.2d at 1016). "A continued, different, 'course of performance' between parties manifests a modification of the original agreement." *Id.* (quoting *Automated Solutions*, 856 N.E.2d at 1016). "Course of performance" is defined as "[t]he understandings of performance which develop by conduct without objection between two parties during the performance of an executory contract." Black's Law Dictionary 352 (6th ed.1990); *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 686-87 (6th Cir. 2000) (applying Ohio law).

The related concept of "waiver by estoppel" exists "when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it." *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust*, 804 N.E.2d 979, 1000 (Ohio Ct. App. 2004) (quotations omitted).  Waiver of contractual rights typically requires consideration, except where the actions of the party making the waiver are such that he must be estopped from insisting upon the right claimed to have been relinquished. *Id.*; *see also Marfield v. Cincinnati, D. & T. Traction Co.*, 145, 144 N.E. 689, 691 (Ohio 1924) ("A 'waiver' is the voluntary surrender or relinquishment of a known legal right or intentionally doing an act inconsistent with claiming it . . . . In the latter case, it may be accomplished by acts or conduct and there may be an estoppel from insisting upon the right claimed to have been relinquished, in which event no consideration is necessary.").  The "lynchpin of this subset of waiver is not when one party forgoes something to which he might be entitled in exchange

---

[14]  Plaintiff and GTC variously refer to this argument as "waiver," "estoppel," and "course of performance."  "It makes no difference what name is applied to that theory whether it be waiver, estoppel, novation or what have you; the theory simply is that the parties showed that they did not intend a particular provision of the contract to be strictly observed." *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 856 N.E.2d 1008, 1016 (Ohio 2006) (additionally referring to the theory as "course of performance").

for consideration, but when he induces the other party to rely on his waiver and continued performance under the contract." *Ragen v. Hancor, Inc.*, -- F. Supp. 2d --, Case No. 08-CV-1022, 2013 WL 351305 at *4 (N.D. Ohio Jan. 29, 2013) (quoting *Motz v. Root,* 53 Ohio App. 375, 4 N.E.2d 990, 991 (Ohio Ct. App. 1934)).

In addition, "the practical construction made by the parties may be considered by the court as an aid to its construction when the contract is ambiguous, uncertain, doubtful, or where the words thereof are susceptible to more than one meaning, or when a dispute has arisen between the parties after a period of operation under the contract." *St. Marys*, 875 N.E.2d at 568 (quoting 18 Ohio Jurisprudence 3d (1980) 46, Contracts, Section 160)).

Applying these principles to the instant case, and construing the facts in the light most favorable to GTC as the non-moving party, the court concludes that genuine issues of material fact exist as to whether Plaintiff waived the Insurance Provisions. GTC points to Plaintiff's acceptance of the 2009 and 2010 Insurance Certificates in support of its argument that Plaintiff waived the Insurance Provisions, because both of those certificates were admittedly non-compliant with the Insurance Provisions. The court notes that the 2010 Insurance Certificate was the only one that Plaintiff received after the June 15, 2009 effective date of the Carrier Agreement. However, Plaintiff's acceptance of the non-compliant 2010 Insurance Certificate is not the only event which might be read to implicitly modify the insurance requirements under the Carrier Agreement. Each time during the coverage period of the 2010 Insurance Certificate that Plaintiff requested GTC ship its products pursuant to the Carrier Agreement,[15] it used GTC's services without demanding compliant insurance coverage. This evidence could indicate that GTC was mislead by Plaintiff's conduct into believing that Plaintiff had waived the Insurance Provisions. Because there are genuine issues of material fact precluding the court's determination of whether Plaintiff waived the Insurance Provisions, summary judgment on the matter is inappropriate. *Compare Ragen*, -- F. Supp. 2d --, 2013 WL 351305 at *4 (genuine issue of material fact precluding summary judgment where

---

[15] The parties have not put before the court facts regarding the number of such shipments GTC handled.

United States District Court
For the Northern District of California

evidence showed contracting party accepted oral modifications despite contract clause prohibiting such modifications).

**D.  Breach of Agreement Not To Subcontract**

Plaintiff alleges that GTC breached the Carrier Agreement by subcontracting the August 31 haul to Ajax without the prior written consent of Plaintiff.  However, according to Plaintiff's records, drivers from Ajax had picked up loads under the Carrier Agreement from Plaintiff's Port Everglades, Florida facility on 15 occasions from February 25, 2010 through August 31, 2010.  It is not clear whether these drivers from Ajax were acting as GTC's substitute service providers under the Carrier Agreement, or had an independent business relationship with Plaintiff.  Nonetheless, under the same principles governing waiver and estoppel discussed above, a fact finder could conclude that Plaintiff should be estopped from asserting its rights under the Subcontracting Provision if it believes Plaintiff accepted drivers from Ajax, acting as GTC's substitute service providers under the Carrier Agreement, on prior occasions without objecting to the lack of Plaintiff's prior written consent to the substitution.  Accordingly, summary judgment on this issue is inappropriate.

**E.  Damages**

Having determined that GTC breached its duty under the Carrier Agreement to defend Plaintiff in the Florida Action or ensure that Ajax do the same, the court turns to the final element in a breach of contract claim: damages.

Plaintiff alleges that it suffered damages as a result of GTC's breach of the Carrier Agreement because it has had to pay for its own defense in the Florida Action.  Plaintiff also seeks the costs incurred to compel GTC's compliance with its contractual defense obligations.  In Ohio, "when an indemnitor wrongfully refuses to defend an action against an indemnitee, the indemnitor is liable for the costs, including attorney fees and expenses, incurred by the indemnitee in defending the initial action and in vindicating its right to indemnity in a third-party action brought against the indemnitor."  *Allen v. Standard Oil Co.*, 443 N.E.2d 497, 500 (1982).  Section 2721.16 of the Ohio Revised Code, which prohibits the award of attorneys' fees to the prevailing party in a declaratory judgment action except in certain circumstances not relevant to this Motion, does not prohibit the

United States District Court

For the Northern District of California

1 award of damages for breach of contract. *See* Ohio Rev. Code Ann. § 2721.16; *see also Goodyear*

2 *Tire & Rubber Co. v. G4S Secure Solutions (USA), Inc.*, Case No. 11-CV-01170-BYP, 2013 WL

3 256938 at *7 (N.D. Ohio Jan. 23, 2013) (granting summary judgment on breach of contract and

4 declaratory judgment action where contracting party wrongfully withdrew its defense and

5 indemnification of other party, and awarding "the costs incurred in this litigation to seek

6 enforcement of the indemnification agreement"). Accordingly, Plaintiff is entitled to attorneys' fees

7 and costs incurred in its defense of the Florida Action and in bringing the instant lawsuit against

8 GTC to enforce the Indemnity and Defense Provision. By June 14, 2013, the parties shall file a

9 stipulation and proposed order setting forth a briefing schedule on Plaintiff's motion for contract

10 damages.

### V. Conclusion

12 For the reasons above, Plaintiff's Motion for Partial Summary Judgment is granted as to

13 Plaintiff's First Cause of Action because GTC breached the Carrier Agreement by failing to defend

14 Plaintiff in the Florida Action, as well as failed to ensure that Ajax would defend Plaintiff in the

15 Florida Action. Summary judgment is also granted as to Plaintiff's Second Cause of Action for

16 declaratory judgment for the above-described breaches of contract. Plaintiff is entitled to damages

17 stemming from these breaches of contract, as well as reasonable attorneys' fees and costs incurred in

18 bringing this lawsuit.[16] Plaintiff's motion is denied as to Plaintiff's allegations that GTC breached

19 the Carrier Agreement by failing to ensure that GTC or Ajax obtain and maintain the insurance

20 coverage required by the Carrier Agreement; failing to ensure that GTC or Ajax named Plaintiff as

21 an additional insured; and subcontracting the August 31 haul to Ajax without the prior written

22 consent of Plaintiff.

23 IT IS SO ORDERED.

24 Dated: June 7, 2013

_____

25 DONNA M. RYU

United States Magistrate Judge

---

27 [16] Summary judgment on the First and Second Causes of Action is granted against only GTC.

28 Summary judgment against JGLC is inappropriate because it has not yet been determined whether JGLC is GTC's alter ego.